## Kentucky Home Life Ins. Co. v. Leisman.

(Decided May 28, 1937.)

826

WOODWARD, DAWSON & HOBSON and L. H. HILTON for appellant.

THOMAS C. MAPOTHER for appellee.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

The insurance policy here involved was issued by the Inter-Southern Life Insurance Company on June 22, 1929, in the amount of $500 on the life of John C. Leisman, aged thirteen. The policy provided for the payment of twenty annual premiums of $10.36 each, with' an endowment at age eighty-five. The premium was based on an assumption that the insured was fifteen years of age instead of thirteen, but no question is here made of this difference. The mother of the insured, Alma L. Leisman, was named as 'beneficiary in the policy and is the appellee here. When the annual premium became due on June 22, 1931, the method of paying premiums was changed from an annual basis to a quarterly basis, payable on the 22d day of June, September, December, and March of each year. Quarterly payments were thereafter made, up to and including December 22, 1932, making in all three and three-fourths premiums that were paid. The quarterly premium due on March 22, 1933, was not paid, and it is claimed by appellant that the policy thereupon lapsed without any value either to purchase extended insurance or to pay the premium then due under the

automatic loan provision of the policy. The insured died on May 12, 1934, one year, one month, and twenty days (415 days) after the alleged lapse of the policy.

Under ordinary circumstances the policy would have had a cash value of $13.75 at the time of the alleged lapse, to be used under the agreed automatic premium loan privilege to continue the insurance in force, and would thus have carried the insurance beyond the date of the death of the insured. The table of loan and surrender values contained in the policy, and based on a policy of $1,000, shows a cash value of $17 upon the payment of the third year's premium and a cash value of $31 upon the payment of the fourth year's premium. There was thus an increase in cash value of $14 during this period. The policy provides: "If fractional premiums in addition to premiums for whole years be paid, due allowance will be made in the above benefits." Applying this provision, three-fourths of the fourth annual premium would add three-fourths of $14, or $10.50, to the cash value of the policy. Thus, the cash value on a $1,000 policy after payment of three and three-fourths premiums would be $27.50. Half of this sum, representing the cash value on a $500 policy, would be $13.75, which, according to all the witnesses, was the reserve available for loan or extension of the insurance in the normal situation.

On April 8, 1932, a suit was instituted in the Franklin circuit court to enjoin the Inter-Southern Life Insurance Company from conducting an insurance business until the further orders of the court. Receivers were appointed, and thereafter, on August 8, 1932, a reinsurance agreement was entered into between the receivers of the Inter-Southern and the appellant, Kentucky Home Life Insurance Company, and approved by the Franklin circuit court. Under this agreement the appellant agreed to assume various liabilities of the Inter-Southern Life Insurance Company, including its policies of insurance, under the terms and conditions therein set out. It was recited that the assets of the Inter-Southern were not sufficient to discharge the obligations assumed under the agreement and, "as part of the consideration there shall be established and placed against each policy reinsured and assumed hereunder by the Company, a lien equal to sixty per cent (60%) of the net equity as hereinafter defined, such lien to

bear interest from June 30, 1932, at the rate of six per cent (6%) per annum, compounded annually. * * * The term 'net equity' as applied to any policy, is hereby defined as the mean reserve on such policy and on any coupon additions or accumulations standing to the credit thereof as of June 30, 1932, less the sum of any indebtedness and accrued interest thereon to said date.''

The substantial effect of this agreement, of course, was to set up a pool by the policyholders to meet the liabilities of the Inter-Southern by placing a loan against each policy, which, when we come to the figures on the policy before us, was actually greater than the cash value of the insurance. The ''mean reserve'' on a policy is a well-recognized term in the insurance business and may be defined as the mean of the reserve at the beginning of the policy year after the premium for such year is paid and the terminal reserve at the end of such policy year. In ascertaining the mean reserve, all of the actuaries who testified in the case added the net premium to the sum of the third terminal reserve and fourth terminal reserve and divided by two. Odd cents were not calculated, and all of the witnesses agree that on June 30, 1932, the mean reserve on this policy was $22, 60 per cent. of which would be $13.20. The amount of the lien, with interest from June 30, 1932, to March 22, 1933, was $13.78, or three cents greater than the cash surrender value of the policy on the latter date.

The cash surrender value, or the reserve for the purchase of extended or paid-up insurance, is ascertained by taking the mathematical reserve and deducting therefrom a surrender charge of not exceeding 2½ per cent. of the face of the policy. Kentucky Statutes, sec. 659. It appears in the policy before us that a surrender charge of less than the amount authorized was deducted. However, it is clear that the mean reserve and the cash surrender value are determind by different methods and are not comparable. It is argued for appellee that 60 per cent. cannot be taken from 100 per cent. without leaving 40 per cent., and that necessarily there must have been some reserve left for the purchase of extended insurance. As we have tried to point out, the error in appellee's contention rests in the assumption that the mean reserve and cash surrender value

are the same thing. Unfortunately for her contention, they are not.

Appellee likewise argues that, having accepted the payment of premiums, the insurer is bound by the terms of the policy and she is therefore entitled to the cash value or extended insurance set out in the table of guaranteed loan and surrender values in the policy. This argument ignores the fact that the policy was amended by the reinsurance agreement, and the liability of the appellant must be predicated on what it assumed to do under its contract. Appellee is not seeking to hold the Inter-Southern Life Insurance Company on the policy, but to hold its reinsurer. Casteel v. Kentucky Home Life Insurance Company, 258 Ky. 304, 79 S. W. (2d) 941. Having elected to continue the policy in force, she cannot hold appellant on its contract of reinsurance and at the same time deny the efficacy of that agreement. It is expressly provided in the policy that "any indebtedness to the company against this policy will be deducted in any settlement hereof," and it is provided in the reinsurance agreement that "both lien and interest thereon shall be deducted from any payment made by the company pursuant to the terms of said policies or from any settlement thereunder or from the value used to purchase any extended insurance except as otherwise hereinafter provided." We find no exception in the agreement which might lend comfort to the appellee.

Appellee likewise insists that, since the calculation of the mean reserve involves an assumption of the payment of the full fourth year's premium, we must assume that this entire premium was actually paid and calculate the cash value on the policy accordingly. Here again appellee confuses the purely theoretical figure which was used as a basis for arriving at the insured's share of the pool made up by the policyholders with the actualities of cash surrender value. The mean reserve was taken as a basis for making a pro rata charge or loan against all of the policies entering into the pool. Any one desiring to stay out of the pool was at liberty to do so, but, having gone in, he must be bound by its terms. The pool was not created for the benefit of appellant, but for the purpose of meeting the liabilities of the Inter-Southern Life Insurance Company. The agreement contemplates this fact and expressly pro-

vides that the earnings derived from the reinsured business should be devoted to the reduction of the policy liens. Perhaps a more equitable distribution of the contribution to be made by the policyholders to the pool might have been devised. With that we are not concerned. We must take the contract as we find it.

Finally, it is argued that it was the duty of the appellant, under the order of the Franklin circuit court approving the reinsurance agreement, to send a copy of that agreement to each assured. It is claimed by appellee that no such copy was ever received by her or by the insured and therefore neither she nor the insured are bound by the terms of that agreement. Conceding, for the purpose of argument, that no copy of the agreement was mailed, appellee nevertheless received numerous notices from the Kentucky Home Life Insurance Company advising her of the date when premiums were due. She paid the premiums and received receipts therefor. She does not claim that she thought she was still making payments to the Inter-Southern Life Insurance Company, nor did she ever request a copy of the agreement. Having made payments of premiums to the new company, she necessarily must have known that some such agreement as that now before us was made. She must accept its burdens with its benefits. The question is really immaterial, for appellee does not contend that the receipt of a copy of the reinsurance agreement would have altered her procedure in any way, and it is difficult to see what she could have done about it other than have perhaps let the policy lapse at an earlier date.

It necessarily results from what we have said that the appellant was entitled to the peremptory instruction in its favor for which it asked. The base figures as to premiums and reserve were not disputed, and the conclusion to be derived therefrom was a mere matter of arithmetic.

Judgment reversed.